831 So.2d 918 (2002)
STATE of Louisiana, in the Interest of L.B.
v.
G.B.B.
No. 2002-CJ-1715.
Supreme Court of Louisiana.
December 4, 2002.
*919 Joseph R. Kutch, Pineville, Counsel for Applicant.
Joshua J. Dara, Sr., Pineville, Walter McClatchey, Jr., Lafayette, Camille J. Giordano, Alexandria, Counsel for Respondent.
TRAYLOR, Justice.[*]
In this proceeding to involuntarily terminate parental rights, we granted a writ of certiorari to determine whether the lower courts erred in refusing to terminate the parental rights of G.B.B., finding the State of Louisiana, Department of Social Services, Office of Community Services (the "State") failed to establish by clear and convincing evidence the statutory grounds for termination of parental rights. After reviewing the record and the applicable law, we reverse the judgments of the lower courts.

FACTS AND PROCEDURAL HISTORY
On April 2, 1999, G.B.B. was confined to the psychiatric ward of Huey P. Long *920 Medical Center, when her fourth child, L.B., was born. L.B. is a special needs child in that she was born with a cleft palate, asthma, a hearing problem and is developmentally delayed in speech and motor skills. In the past, G.B.B. had three other children removed from her custody because of physical abuse, neglect and/or lack of supervision. Specifically, two of G.B.B.'s older children are currently in the custody of their grandmother and G.B.B.'s parental rights to her third child, M.B., were terminated in 1995.

Termination of G.B.B.'s Parental Rights to M.B.
In M.B.'s case, the evidence showed that on August 8, 1991, four days after his birth, G.B.B. began hearing voices in her apartment, and at four o'clock in the morning, took M.B. out of the apartment to wander the streets. A gas station attendant became concerned and notified the police. After this episode, M.B. was taken into state custody and, subsequently, declared a child in need of care on September 27, 1991. In the intervening years, G.B.B. was confined at mental institutions intermittently and was hospitalized at Central Louisiana State Hospital at the time of trial regarding M.B.'s child in need of care case.
On January 13, 1993, the State filed a petition to terminate G.B.B.'s parental rights to M.B., on the basis of, among other things, her "past history of neglecting and abusing her children," and "current observations with regard to [her] current child care behavior and practices with her infant son [M.B.]." On December 6, 1995, the trial court terminated G.B.B.'s parental rights to M.B. pursuant to the 1992 version of La. Ch.Code art. 1015(7).[1]
The court of appeal affirmed the termination of G.B.B.'s parental rights to M.B., noting the testimony of her clinical psychologist who opined that she was incapable of exercising her parental responsibilities without exposing M.B. to substantial risk of serious harm and G.B.B.'s own testimony that she was not able to exercise her parental responsibility at that time.

Termination of G.B.B.'s Parental Rights to L.B.
The instant case of termination of parental rights involves G.B.B.'s fourth child, L.B. On April 2, 1999, when L.B. was born, G.B.B. was confined to the psychiatric ward at the Huey P. Long Medical Center. On April 8, 1999, six days after her birth, L.B. was removed from her mother's custody *921 and placed with the State after the trial court issued an order in the Child in Need of Care proceeding.
On July 8, 1999, L.B. was adjudicated a child in need of care.[2] Initially, the State's goal was to transfer custody of L.B. to a relative. Because of G.B.B.'s longstanding case history with the State regarding her other three children dating back to the early eighties, the State did not consider reunification to be an option in L.B.'s case. In October 1999, after family placement options proved to be unsuccessful, the State changed its case plan from placement with a relative to adoption.
On February 4, 2000, the State filed the instant matter petitioning for the termination of G.B.B.'s parental rights to L.B. The trial of the matter was held on January 16, 2001. The trial court issued a judgment dismissing the State's petition for termination on December 7, 2001. On review, the court of appeal affirmed. The State appeals the judgments of the lower courts. For the reasons set forth below, we reverse those judgments.

LAW AND DISCUSSION
As this court has previously noted, in any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. In Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children. These interests warrant great deference and require full, vigilant due process protection that fair procedure be followed when the State seeks to terminate the parent-child legal relationship. Balanced against those protections is the child's profound interest in terminating parental rights which prevent adoption and hamper the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. Lehman v. Lycoming County Children's Serv.'s Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also, State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing the parents' and the child's interests, the courts of this state have consistently found the interests of the child to be paramount over those of the parents. See, e.g., State in the Interest of S.M., 719 So.2d at 452; State in the Interest of A.E., 448 So.2d 183, 186 (La.App. 4 Cir.1984); State in the Interest of Driscoll, 410 So.2d 255, 258 (La.App. 4 Cir.1982).
Recognizing these interests, this court has further stated:
The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and *922 the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.
State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811-12 (citations omitted).
Title X of the Children's Code governs the involuntary termination of parental rights. La. Ch.Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In addition, La. Ch.Code art. 1035 provides the petitioner "bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence." Essentially, termination of parental rights is a two prong inquiry. First, the State, by clear and convincing evidence, must establish at least one ground for termination under article 1015. See La. Ch.Code art. 1035A; See Santosky v. Kramer, supra, (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence). Second, only after a finding that at least one of the enumerated grounds set forth in La. Code Civ. P. Art. 1015 is satisfied, the trial court must determine whether the termination is in the best interest of the child. La. Ch.Code art. 1039. See State in Interest of ML & PL, 95-0045 (La.9/5/95), 660 So.2d 830, 832.

A. Grounds for Termination of Parental Rights Under La.Code Civ. P. art. 1015
In the instant case, the State sought termination of G.B.B.'s parental rights under La. Ch.Code art. 1015(3)(j) "and other applicable provisions." In addition to those subsections specifically discussed by the trial court and the State, i.e., subsections (3)(j) and (5), the court of appeal determined the only other provision which could be applicable to this case is La. Ch.Code art. 1015(3)(k).
We find the lower courts did not err in determining termination of G.B.B.'s parental rights was not proper under La. Ch.Code art. 1015(3)(j) and (5). However, we find the lower courts did err in determining termination was not established by clear and convincing evidence under the provisions of La. Ch.Code art. 1015(3)(k).
La. Ch.Code art. 1015(3)(k) provides:
The parent's parental rights to one or more of the child's siblings have been terminated due to neglect[[3]] or abuse[[4]] and prior attempts to rehabilitate the parent have been unsuccessful. *923 For La. Ch.Code art. 1015(3)(k) to apply, the State must prove (1) that G.B.B.'s parental rights to M.B. were terminated "due to neglect or abuse" and (2) that prior attempts to rehabilitate G.B.B. have been unsuccessful.

Previous Termination Due to Neglect or Abuse
G.B.B.'s parental rights to her third child, M.B., were terminated in 1995, after an initial finding by the trial court that M.B. was a child in need of care based on neglect and possible abuse. The termination in M.B.'s case was based on the 1992 version of La. Ch.Code art. 1015(7), which at that time required the State to prove, among other things, that G.B.B.'s condition continued to render her unable or incapable of exercising parental responsibilities without exposing M.B. to a substantial risk of serious harm.
The record in M.B.'s termination case was introduced at trial in the instant matter. A review of that record finds M.B. came into the custody of the State by a request for an instanter order, wherein the State alleged abuse and/or neglect of M.B. and that G.B.B. was unable to care for the child. Four days after the birth of M.B., G.B.B. with M.B. was found wandering the streets at four o'clock in the morning, complaining of hearing voices in her apartment which said they were going to kill her. She left the apartment without milk or appropriate items for the care of M.B. The State intervened and removed M.B. from G.B.B.'s custody. Thereafter, M.B. was adjudicated a child in need of care and, subsequently, the State petitioned for termination of G.B.B.'s rights to M.B. The State specifically alleged:
The basic needs of this child were not met at the time this child was taken into custody and would not be met at the present time, either. There is no reasonable expectation of reformation on the part of [G.B.B.] due to her chronic mental problems which have caused her repeated hospitalizations, in addition to her failure to cooperate with the Agency to allow the Agency to receive her medical records and try to obtain additional assistance.
Further, testimony revealed M.B. was a special needs child in that he was diagnosed with a severe case of attention deficit hyperactivity disorder. He attended a behavior modification therapy program and, at that time, he was taking ten milligrams of ritalin three times a day. In addition, testimony revealed he would require constant supervision as he was highly impulsive. Ultimately, the appellate court, in agreement with the trial court, found G.B.B. incapable of exercising her parental responsibilities without exposing M.B. to substantial risk of serious harm. G.B.B.'s parental rights to M.B. were terminated.
Based on a review of M.B.'s record, we conclude the lower courts erred in failing to recognize that because M.B. was adjudicated a child in need of care, the State's termination proceeding was essentially based on the premise that M.B. was abused or neglected. As previously noted by this court, the lower courts should be cognizant of the fact that the legislature has expressed its intent that courts shall construe the procedural provisions of Title X of the Children's Code liberally. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. La. Ch.Code art. 1001; See State ex rel. J.A., 752 So.2d at 812. Before a trial court may adjudicate a child in need of care under Title VI of the Children's Code, the State must allege and prove by a preponderance of the evidence one or more of the statutorily expressed *924 allegations in La. Ch.Code art. 606(A).[5] All the grounds listed required showings based on either abuse or neglect, whether criminal or non-criminal.
In the instant case, the court of appeal narrowly interpreted the trial court's termination of parental rights to M.B. as based solely on G.B.B.'s mental illness yet recognized the fact she was incapable of caring for M.B. in light of his condition and need of constant supervision. As we recognized in State ex rel. J.A., the legislature defined "neglect" in broad terms. La. Ch. Code art. 603(14) provides:
"Neglect" means the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired.
The reason for the "neglect" or the parent's inability to care for the child, i.e., mental illness, is not the proper inquiry.[6] Rather, the proper inquiry is whether the result of the parent's actions are such that the parent has failed to supply the child with the necessary care. It is clear from the record in M.B.'s case that G.B.B.'s parental rights were terminated by virtue of her inability to care for M.B., i.e., her neglect and/or abuse of M.B. Thus, we find G.B.B.'s termination of her parental rights to her previous child, M.B., meets the first requirement of La. Ch.Code 1015(3)(k).

Rehabilitation of G.B.B. Unsuccessful
The second inquiry under La. Ch.Code art. 1015(3)(k) is whether the State established that prior attempts to rehabilitate G.B.B. have been unsuccessful. The record in M.B.'s termination case established then that G.B.B.'s "prognosis is poor based upon her longstanding psychiatric history, even if periodically her mental condition may improve temporarily." In the instant *925 matter, the trial court acknowledged it "does not know if [G.B.B.] will ever be able to care for or obtain custody of [L.B.]" and that "[s]he is not able to at this time." In addition, the court of appeal acknowledged "there is no question that G.B.B. is an ill woman" and further acknowledged her history of non-compliance with regard to her medications and that she has been a "difficult client," cursing her caseworker, and refusing to answer questions.
By way of background, G.B.B., a forty year old female, has been diagnosed with schizo-affective disorder and bipolar disorder.[7] G.B.B. is taking at least four medications to help control her illness, one of which is by injection to assist in compliance. Although she has a history of non-compliance as it pertains to taking her medications, her current treating psychiatrist, Dr. Brenda Price, testified she has been compliant for the last six months. However, Dr. Price also testified that it is within reasonable probability that if G.B.B. were to stop taking her medications she would relapse, becoming a danger to herself and others and requiring hospitalization as in the past. In addition, Dr. Price could not state with any certainty, given G.B.B.'s diagnosis, whether she would continue to be compliant. Also, she could not state an opinion of whether G.B.B. had the ability to take care of L.B., explaining it was not her area of expertise and she could not make such an assessment.
Moreover, Dr. John Simoneaux, a licensed psychologist, testified that he had known and seen G.B.B. in various capacities for over fifteen years as he worked in the psychiatric ward at Huey P. Long Medical Center and Central State Hospital. He confirmed G.B.B.'s history of non-compliance with her medication and noted she had been hospitalized for her illness at least eight times. The latest had been for a three year period from 1995 to 1998. Dr. Simoneaux last saw her on February 21, 2000, for a scheduled evaluation to assess her ability to care for L.B.; however, he testified the assessment could not be completed because G.B.B. would not cooperate with the testing and became very loud, angry and used profanity in front of children and other persons in his office. Dr. Simoneaux testified that based on his prior knowledge of G.B.B. and what he observed in his office on February 21, 2000, as far as G.B.B.'s mental status, she had not changed that much and her behavior was consistent with how he had seen her in the hospital on several previous occasions. More importantly, Dr. Simoneaux testified that six months is not long enough to gauge compliance for someone with G.B.B.'s illness history and is insufficient to determine future compliance. Moreover, he testified that because G.B.B. has a chronic mental illness that was diagnosed at such an early age, she had a "poor, very poor prognosis" of getting any better.
Based on a review of the record, we conclude the lower courts erred in determining G.B.B.'s efforts to rehabilitate herself by taking her medication for a mere six month period is an appropriate gauge for future compliance given her history of illness. As noted by her treating psychiatrist, it is within a reasonable probability that if G.B.B. were to stop taking her medication she would relapse, becoming a danger to herself, to others, and especially L.B. Thus, we find the State established that prior attempts to rehabilitate G.B.B. *926 have been unsuccessful, meeting the second requirement of La. Ch.Code 1015(3)(k).
B. The Best Interest of L.B.
After a finding that at least one of the grounds set forth in La. Ch.Code art. 1015 has been established by clear and convincing evidence, the trial court must then determine whether termination of parental rights is in the best interest of the child. See La. Ch.Code art. 1037(A). In the instant case, however, the lower courts did not address this issue, having found the State failed to prove any of the statutory grounds for termination under La. Ch. Code art. 1015. Based a review of the entirety of the record, we find termination of G.B.B.'s parental rights is in the best interest of L.B.

CONCLUSION
As recognized by this court, permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. State ex rel. S.M.W., 00-3277 (La.2/21/01), 781 So.2d 1223. However, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proved by clear and convincing evidence. Id. at 1238. In the instant case, this court finds the State established grounds for termination pursuant to La. Ch.Code art. 1015(3)(k). Further, this court finds based on the record that termination is in the best interest of L.B. Therefore, the lowers court erred in failing to terminate the parental rights of G.B.B. regarding her fourth child, L.B., pursuant to La.Code Ch. art. 1015(3)(k). Accordingly, we reverse the judgments of the lower courts.

DECREE
The judgments of the lower courts are set aside and the case is remanded to the trial court for further proceedings consistent with this opinion.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Associate Justice Jeannette T. Knoll, recused.
[1] Prior to the 1997 legislative changes, La. Ch.Code art. 1015(7) provided:

The grounds set forth in the petition must meet all of the conditions of any one of the following paragraphs:
* * *
(7) Loss of custody due to the parent's condition
(a) One year has elapsed since a court order placing the child in the custody of the department.
(b) The child was removed from the custody of his parents because of the parent's mental illness, mental retardation, or substance abuse.
(c) The parent's condition continues to render the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm.
(d) Despite notice by the department, the parent has refused or failed to provide a plan for the appropriate care of the child other than foster care.
(e) Every reasonable effort has been made under the circumstances to rehabilitate the parent, and such efforts have failed.
(f) There is no reasonable expectation that the parent's condition will change or that he will be rehabilitated in the foreseeable future.
(g) According to expert testimony or proof of an established pattern of behavior, termination of parental rights and adoption are in the child's best interest.
[2] L.B.'s father executed an act of surrender and, thus, his parental rights are not at issue.
[3] La. Ch.Code art. 1003(10) defines neglect as:

[T]he refusal or failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired.
[4] La. Ch.Code art. 1003(1) defines abuse as:

[A]ny of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a) The infliction or attempted infliction, or, as a result of inadequate supervision, the allowance or toleration of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
(b) The exploitation or overwork of a child by a parent or any other person.
(c) The involvement of the child in any sexual act with a parent or any other person, or the aiding or toleration by the parent or the caretaker of the child's sexual involvement with any other person or of the child's involvement in pornographic displays, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
[5] La. Ch.Code art. 606(A) provides:

A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
(2) The child is a victim of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child's welfare is otherwise endangered if left within the parent's custody or control.
(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.
[6] We note that a finding of mental illness, standing alone, is insufficient grounds to warrant termination of G.B.B.'s rights. Instead, the mental deficiency must be related to the parenting ability. That is, if the evidence provides clear and convincing evidence that the prognosis for [the parent's] recovery in the near future is poor and there is no reasonable expectation of significant improvement in her condition in the near future, then termination is proper if it is in the best interests of the child and the additional grounds for termination have been met. See State ex rel. J.A., 752 So.2d at 814.
[7] G.B.B. first received mental health treatment at age eleven in Arkansas. She has received mental health treatment in Louisiana since 1977 and has been in numerous psychiatric hospitals and facilities since that time, including Central State Hospital, Bayou Rapides Psychiatric Hospital, Huey P. Long Psychiatric Ward and East Louisiana Hospital.